DAN ROTH (CA 270569)
LAW OFFICE OF DAN ROTH
803 Hearst Avenue
Berkeley, CA  94710
Phone: (510) 849-1389
E-mail: dan@drothlaw.com

LARA BAZELON (CA 218501)
2130 Fulton St., Room 211
San Francisco, CA 94117
Phone: (415) 422-6202
E-mail: lbazelon@usfca.com

JOSHUA ENGEL (OH 0075769)
*Pro hac vice application pending*
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
Phone: (513) 445-9600
engel@engelandmartin.com

*Attorneys for Plaintiff Jane Doe*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND OR SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE, | Case No. 19-cv-4923 |
| Plaintiff, | COMPLAINT FOR DAMAGES |
| v. | |
| TIMOTHY WHITE, Chancellor; SARAH CLEGG, Title IX Coordinator, Sonoma State University; JOYCE SUZUKI; WILLIAM KIDDER; JESSE ANDREWS, | |
| Defendants. | |

1

1.   Plaintiff Jane Doe brings this action for a declaratory judgment and damages against the above-named defendants under 42 U.S.C. § 1983, for violations of her rights under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution.

2.   This case arises out of Sonoma State University's decision to proceed with a disciplinary proceeding against Jane Doe in violation of her constitutional right to due process and in the process, deliberately depriving Doe of her education.

3.   Jane Doe was falsely accused of sexually harassing three classmates by engaging in a sensual dance during a school-sanctioned dream-based movement exercise.  A brief investigation would have concluded that the allegations, which included  the absurd claim that Doe masturbated in class, were demonstrably false, and that the three students who made the allegation deeply disliked Doe and did not want her to be in their eleven-person graduate studies cohort.  Instead, in direct violation of Doe's constitutional rights, not to mention Title IX and relevant university policies, Defendants buckled under pressure from the complaining students, who threatened to withdraw from the school if Doe was allowed to continue going to class.  To assuage the complainants, Defendants purported to "investigate" the case for 14 months.  Doe was summarily suspended for that entire time, prohibited from returning to class for her second year of study while the purported investigation was ongoing.

4.   In so doing, Defendants deprived Doe of the ability to finish her Master's degree. Defendants informed Doe three days before the commencement of her second year of school that she could not attend classes until the investigation was completed.  The investigation—of what should have been an open-and-shut case because the allegations were plainly baseless—was not completed until what would have been the end of Doe's second and final year.

5.   On August 22, 2018, three months after Doe would have completed her Master's degree, and a year after telling her she couldn't attend her second year of classes, Sonoma State found Doe *not responsible* for the alleged misconduct.  From start to finish, the so-called investigation of an obviously frivolous complaint took 15 months.  During that entire time, Doe could not go to school.

6.   The Complaining students appealed the finding for Doe.  The Office of the Chancellor affirmed that no sexual harassment occurred and that *no reasonable person* would have found that the alleged conduct constituted sexual harassment.

7.   Defendants knowingly deprived Doe of her constitutional rights by suspending Doe without a hearing.

## PARTIES

8.   Plaintiff Jane Doe ("Doe") was from August 2016 to October 2017 a graduate student at Sonoma State University.

    a.   Doe is a California resident with a residence at [OMITTED]. In 2016 and 2017, Doe completed two semesters of coursework in Sonoma State's Master's program in Depth Psychology.

    b.   Doe was scheduled to graduate from Sonoma State with a Master's Degree in Depth Psychology in May 2018, but was forced to withdraw from the program and the University after being prohibited from attending class by Title IX Officer Joyce Suzuki on or about August 19, 2017.

    c.   The disclosure of Jane Doe's identity will cause her irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34  CFR Part 99.

9.   Defendant TIMOTHY WHITE is the Chancellor of the California State University System, with a principal place of business at 401 Golden Shore, Long Beach, California 90802.  Chancellor White is responsible for the issuance of Executive Orders that govern policy throughout the CSU system, including Executive Order 1097 (the CSU Title IX Policy), and for overseeing appeals filed under Executive Order 1097.  White is sued in his individual capacity for damages.

10. Defendant SARAH CLEGG is the Director of Title IX & HR Compliance Services at Sonoma State.  She has a principal place of business at International Hall, 2nd Floor, Sonoma State University, Rohnert Park, California, 94928.

    a.   Clegg is sued in her individual capacity for damages.

b. On information and belief, Clegg has been acting under the policies, procedures, and practices of the CSU, and, in particular, those policies designed to implement Title IX.

c. Clegg is responsible for administering and operating Executive Order 1097 on Sonoma State's campus.

11. Defendant Joyce Suzuki was the Sonoma State University Title IX coordinator from at least January 1, 2017, to approximately September 2017.

a. Suzuki is sued in her individual capacity for damages.

b. On information and belief, Suzuki was at all relevant times acting under the policies, procedures, and practices of the CSU, and, in particular, those policies designed to implement Title IX.

c. Suzuki was during the relevant time period responsible for administering and operating Executive Order 1097 on Sonoma State's campus.

12. Defendant William Kidder was the Sonoma State University Acting Title IX Coordinator from approximately September 2017 through May 2018, and oversaw the investigation of the underlying matter during that time.

a. Kidder is sued in his individual capacity for damages.

b. On information and belief, Kidder was at all relevant times acting under the policies, procedures, and practices of the CSU, and, in particular, those policies designed to implement Title IX.

c. Kidder was during the relevant time period responsible for administering and operating Executive Order 1097 on Sonoma State's campus.

13. Defendant Jesse Andrews was the Sonoma State University Deputy Title IX Coordinator and a Sonoma State University Title IX Senior Investigator and Trainer during the relevant time period.

a. Andrews is sued in his individual capacity for damages.

b.  On information and belief, Andrews was at all relevant times acting under the policies, procedures, and practices of the CSU, and, in particular, those policies designed to implement Title IX.

c.  Andrews was during the relevant time period responsible for administering and operating Executive Order 1097 on Sonoma State's campus.

## JURISDICTION AND VENUE

14. This case arises, in part, under the laws of the United States, specifically 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

15. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

### SEXUAL MISCONDUCT ON CAMPUSES

1.  Sonoma State University is one of the 23 campuses of the California State University system, which was created by the California State Legislature in the 1960 Donohoe Higher Education Act.  Sonoma State's principal place of business is 1801 E. Cotati Avenue, Rohnert Park, California, 94928.  The California State University Board of Trustees is the governing body of Sonoma State University and all CSU schools.  The Board of Trustees consists of 25 members—nine voting members and two student nonvoting members.

2.  After years of criticism for being too lax in enforcing prohibitions on campus sexual assault, colleges and universities are overcorrecting by using Title IX to crack down on alleged perpetrators.  This overcorrection has come at the cost of due process.  In case after case,—both state and federal courts around the country have found that schools, including CSU institutions, have denied accused students fundamental constitutional rights in a rush to find them "responsible" and impose severe sanctions.

3.   More specifically, California's state appellate courts have held that California universities, in their zeal to comply with the spirit of regulatory guidance – and threats of deprivation of funds – by the U.S. Department of Education, overcorrected and subverted due process.[1]

4.   In response to the California Court of Appeals' 2019 ruling in *Doe v. Allee*, schools including the CSU have overhauled the very Title IX process under which Ms. Doe was investigated and disciplined.

**I.   Title IX Statutory & Regulatory Framework**.

5.   The issue of sexual assaults on college and university campuses is, at the federal level, primarily addressed by an act of Congress known as Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

6.   Title IX requires every college and university that receives federal funds to establish policies and procedures to address sexual assault and sexual harassment, including a system to investigate and adjudicate charges of sexual assault by one student against another.  A school violates a student's rights under Title IX regarding student-on-student sexual violence if:  (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational programs;[2] and (2) the school, upon notice, fails to take

---

[1] *See*, *e.g.*, *Doe v. Allee*, 30 Cal.App.5th 1036 (2019); *Doe v. Claremont McKenna College* 25 Cal.App.5th 1055 (2018); *Doe v. University of Southern California*, 246 Cal.App.4th 221 (2016); *Doe v. Regents of the University of California*, 5 Cal.App.5th 1055 (2016); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), *reh'g en banc denied*, 2018 U.S. App. LEXIS 28773; *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017).   A number of recent lawsuits challenging similar procedures have survived preliminary motions as federal courts expressed concern about the failure of schools to comply with their own procedures.  *See*, *e.g*, *Doe v. Amherst* College, D.Mass. Civ. No. 15-30097-MGM, 2017 U.S. Dist. LEXIS 28327, at *41 (Feb. 28, 2017) (denying motion for judgment on pleadings for breach of contract for school policies enacted due to OCR pressure); *Naumov v. McDaniel College, Inc*., D.Md. No. GJH-15-482, 2017 U.S. Dist. LEXIS 49887, at *29 (Mar. 31, 2017) (rejecting argument that Dear Colleague Letter required breach of college handbook); *Collick v. William Paterson Univ*., D.N.J. No. 16-471 (KM) (JBC), 2016 U.S. Dist. LEXIS 160359, at *69-70 (Nov. 17, 2016) ("the Complaint sufficiently alleges that Defendants did not adhere to [the school's] own rules, that the procedure they followed was unfair, and that the decision was not based on sufficient evidence"); *Doe v. Brandeis Univ*., 177 F. Supp. 3d 561, 600 (D.Mass.2016) ("the Court concludes that the complaint plausibly alleges that [the school] did not provide 'basic fairness' to" accused student); *Doe v. Lynn Univ., Inc*., S.D.Fla. No. 9:16-CV-80850, 2017 U.S. Dist. LEXIS 7529, at *17 (Jan. 19, 2017) (plaintiff stated valid claims for of contract and breach of the implied covenant of good faith and fear dealing in connection with sexual assault investigation).

[2] OCR requires that the conduct be evaluated from the perspective of a reasonable person in

6

prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. The fundamental legal and regulatory principle of this system, is that it be "prompt and equitable."[3]  OCR, which is in charge of the administrative enforcement of Title IX, has expanded on this basic mandate through (a) regulations promulgated through notice-and-comment rule making[4] that "have the force and effect of law;"[5] and (b) "significant guidance documents" such as the "Q&A on Campus Sexual Misconduct" issued September 2017 and the September 22, 2017 "Dear Colleague Letter." [6]

7.     A school's procedures must, at a minimum, (1) "ensure the Title IX rights of the complainant," and "accord due process to both parties involved,"[7] a requirement applicable to both state and private schools;[8] (2) provide an "adequate, reliable, and impartial investigation;"[9] (3) provide the complainant and the accused student "an equal opportunity to present relevant witnesses and other evidence;"[10] (4) ensure that the "factfinder and decision maker . . . have adequate training or knowledge regarding sexual violence"[11]; and (5) require  proceedings to be documented and include written findings of fact and reports that summarize all evidence, both inculpatory and exculpatory evidence.[12]

8.     When OCR set forth guidance that "in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence

---

the alleged victim's position, considering all the circumstances.
   [3] 34 C.F.R. § 106.8 (b).
   [4] OCR, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX (2001) at 36 n.98 (notice of publication at 66 Fed. Reg. 5512 (January 19, 2001) ("2001 Guidance") (http://www.ed.gov/ocr/docs/shguide.html).
   [5] *Chrysler Corp. v. Brown* (1979) 441 U.S. 281, 295, 301-02 (regulations promulgated pursuant to notice-and-comment rulemaking that affect individual rights and obligations "have the force and effect of law").
   [6] Available at https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/sex.html.
   [7] 2001 Guidance at  22.  S
   [8] *E.g.*, OCR Ruling re Complaint #04-03-204 (*Christian Brothers Univ.*) (Mar. 26, 2004) at 7 ("due process protections [are] inherent in the Title IX regulatory requirements").
   [9] 2001 Guidance at 20.
   [10] *Id.*; 2017 Dear Colleague Letter at 3.
   [11] *Id.*; 2001 Guidance at 21.
   [12] 2017 Dear Colleague Letter at 5.

standard"[13]. . .  OCR also advised that Title IX has incorporated and adopted the procedural provisions applicable to Title VI of the Civil Rights Act of 1964.[14]

9.    The Administrative Procedure Act requires that that any sanction imposed must be "supported by and in accordance with [] reliable, probative and substantial evidence,"[15]  (*See* 5 U.S.C. § 556(d).)  5 U.S.C. § 556(d) also provides in relevant part:

> . . . A party [in an administrative proceeding] is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts.[16]

10.    Given the disruptive and intrusive nature of a Title IX investigation, the psychological toll it exacts on the students involved, and the need for prompt action, the regulations make clear that delay in the investigation and resolution of complaints should be avoided.[17]  "A critical issue under Title IX is whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects."[18]  Extensions of time are to be based on good cause, and schools must provide notice to the parties with the reason for the delay.[19]

11.    Students facing suspension or expulsion have interests qualifying for protection of the Due Process Clause.[20]

12.    California's procedural and substantive standards for student disciplinary proceedings

---

[13] The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard.  2017 Dear Colleague Letter, at 5.

[14] *See* 34 C.F.R. § 106.71.

[15] 5 U.S.C. § 556(d).)

[16] *Id*.

[17] 34 C.F.R. § 106.8 (b); 34 C.F.R. § 106.8(b); 2001 Guidance at (V)(D); see also 34 C.F.R. § 668.46(k)(2)(i) (proceedings arising from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result.")

[18] 2001 Guidance at iii.

[19] 2001 Guidance at IX; see also 34 C.F.R. § 668.46(k). Postsecondary institutions are required to report publicly the procedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, and stalking (34 C.F.R. § 668.46 (k)(1)(i)), and to include a process that allows for the extension of timeframes for good cause with written notice to the parties of the delay and the reason for the delay. 34 C.F.R. § 668.46 (k)(3)(i)(A).

[20] *Goss v. Lopez*, 419 U.S. 565, 577 (1975).

begin with Code Civ. Proc. § 1094.5 subdivisions (b) and (c), which require that (1) there be "a fair trial," which "means that there must have been 'a fair administrative hearing'"[21]; (2) the proceeding be conducted "in the manner required by law"; (3) the decision be "supported by the findings"; and (4) the findings be "supported by the weight of the evidence," or where an administrative action does not affect vested fundamental rights, the findings must be "supported by substantial evidence in the light of the whole record."[22]   In addition, a reviewing court does not "blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . It must be reasonable . . . credible, and of solid value."[23]   "The ultimate determination is whether a reasonable trier of fact could have found for the respondent based on the whole record."  (Id.)

### a.   Access to Evidence

13.   A fair process also requires the university to present the evidence to the accused student so that the student has a reasonable opportunity to prepare a defense and to respond to the accusation.  : ". . . requiring [the accused] to request access to the evidence against him does not comply with the requirements of a fair hearing.[24]

14.   In effectively suspending Doe without providing her this requirement of a fair process, Respondents improperly deprived Doe of "a full opportunity to present [her] defense."[25]

15. The CSU has adopted certain policies and procedures for the investigation and adjudication of alleged sexual misconduct, as required by Title IX.

16. The CSU policy governing alleged student sexual misconduct during the relevant time period is Executive Order 1097, "Systemwide *Policy* Prohibiting Discrimination, Harassment and Retaliation, Sexual Misconduct, Dating and Domestic Violence, and Stalking against Students and

---

[21]  *Doe v. Univ. of Southern California* (2016) 246 Cal.App.4th 221, 239 (citations omitted).

[22] California has undertaken to protect vested fundamental rights "from untoward intrusions by the massive apparatus of government."  *Bixby v. Pierno*, 4 Cal.3d 130, 142-143 (1971).

[23] *Kuhn v. Dep't of General Services*, 22 Cal.App.4th (1994) 1627, 1633.

[24] *Doe v. USC*, *supra*, 246 Cal.App.4th at 245-246, *citing Goss v. Lopez*, 419 U.S. 565, 582 (1975).

[25] *Andersen v. Regents of Univ. of Cal.*, 22 Cal.App.3d 763, 771 (1972) ("The hearing need not be a full dress judicial hearing but one giving the student a full opportunity to present [their] defenses.")

Systemwide *Procedure* for Addressing Such Complaints by Students," Revised October 5, 2016 (emphasis in original).  (A copy of Executive Order 1097 is attached as Exhibit A.)

17. Executive Order 1097 is founded on the CSU's commitment "to maintaining an inclusive community that values diversity and fosters tolerance and mutual respect," and states that "[a]ll students have the right to participate fully in CSU programs and activities free from Discrimination, Harassment, and Retaliation."  Ex. A at 3 (EO 1097 at 1).  As such, E.O. 1097 "prohibits Harassment of any kind, including Sexual Harassment, as well as Sexual Misconduct, Dating and Domestic Violence, and Stalking."  *Id*.

18. Sexual harassment is defined by Executive Order 1097 as "a form of Sex Discrimination" that "is unwelcome verbal, nonverbal, or physical conduct of a sexual nature that includes but is not limited to sexual advances, requests for sexual favors, and any other conduct of a sexual nature where:

    a. Submission to, or rejection of, the conduct is explicitly or implicitly used as the basis for any decision affecting a Complainants academic status or progress, or access to benefits and services, honors, programs, or activities available at or through the University; or

    b. The conduct is sufficiently severe, persistent, or pervasive that its effect, whether or not intended, could be considered by a reasonable person in the shoes of the Complainant, and is in fact considered by the Complainant, as limiting his or her ability to participate in or benefit from the services, activities or opportunities offered by the University; or

    c. The conduct is sufficiently severe, persistent or pervasive that its effect, whether or not intended, could be considered by a reasonable person in the shoes of the Complainant, and is in fact considered by the Complainant, as creating an intimidating, hostile or offensive environment.  E.O. 1097 at

19. Examples of Sexual Harassment are listed in Executive Order 1097:

    a. Sexual Harassment could include being forced to engage in unwanted sexual contact as a condition of membership in a student organization; being subjected to video

exploitation or a campaign of sexually explicit graffiti; or frequently being exposed to unwanted images of a sexual nature in a classroom that are unrelated to the coursework.

b. Sexual Harassment also includes acts of verbal, non-verbal or physical aggression, intimidation or hostility based on Gender or sex-stereotyping, even if those acts do not involve conduct of a sexual nature.

c. This policy covers unwelcome conduct of a sexual nature. While romantic, sexual, intimate, personal or social relationships between members of the University community may begin as consensual, they may evolve into situations that lead to Sexual Harassment or Sexual Misconduct, including Dating or Domestic Violence, or Stalking, subject to this policy.  E.O. 1097 at 27.

### Executive Order 1097 Due Process Requirements

20. Executive Order 1097 provides that allegations of sexual misconduct – including sexual harassment – involving accused students will be investigated by a Discrimination, Harassment, and Retaliation Administrator/Title IX Coordinator.

a. The policy requires that "All investigation and reviews shall be conducted impartially and in good faith."  E.O. 1097 at 20.

b. The policy requires all students "to cooperate with the investigation and other processes set forth" in Executive Order 1097.  E.O. 1097 at 18.

c. Executive Order 1097 requires that "**Within sixty (60) Working Days after the intake interview,** the Investigator shall complete the investigation, write and submit an investigation report to the campus designated DHR Administrator or Title IX Coordinator.  If this timeline is extended pursuant to Article V.E, it shall not be extended for a period longer than an additional thirty (30) Working days from the original due date."  E.O. 1097 Attachment B at 1 (emphasis in original).

i. The policy allows for "reasonable" extensions of time for campus investigations "that should not exceed and additional **30 Working Days**" (emphasis in original), and mandates that the complainant and accused student "shall receive written notification of any period of extension."  E.O. 1097 at 18.

    d.  Both the complainant and accused student have the right to identify witnesses and other evidence "for consideration," but "the CSU shall decide what evidence is relevant and significant to the issues raised." E.O. 1097 at 18.

    e.  At the conclusion of the investigation, the investigator will prepare a written report of the findings of the investigation.

21. The standard of review used to determine whether there is a violation of Executive Order 1097 is "preponderance of the evidence," which Executive Order 1097 defines as "the greater weight of the evidence; i.e., that the evidence on one side outweighs, preponderates over, or is more than, the evidence on the other side."

    a.  The preponderance standard applies "for demonstrating facts and reaching conclusions in an investigation conducted pursuant to" Executive Order 1097. E.O. 1097 at 25.

22. "Interim Remedies" are available to Complaining students "prior to the conclusion of an investigation in order to immediately stop any wrong-doing and/or reduce or eliminate any negative impact, when appropriate." E.O. 1097 at 25. Interim Remedies are not provided for the Respondent.

    a.  Interim Remedies must be "reasonable." E.O. 1097 at 26.

    b.  Executive Order 1097 lists the following examples of possible Interim Remedies:

        i.  Psychological counseling services;

        ii.  Changes to academic or living situations;

        iii.  Completing a course and/or courses on-line (if otherwise appropriate);

        iv.  Academic tutoring;

        v.  Arranging for the re-taking of a class or withdrawal from a class without penalty; and/or

        vi.  Any measure as appropriate to stop further alleged harm until an investigation is concluded or a resolution is reached. E.O. 1097 at 26.

23. Pursuant to Executive Order 1097, the Title IX Coordinator is required to "assist and provide the Complainant with reasonable Remedies as requested throughout the reporting,

investigation, appeal, and disciplinary processes, and thereafter.  E.O. 1097 at 26.  No similar requirement of reasonable assistance and support is mandated to be provided to Respondents.

24. Possible sanctions for violations of Executive Order 1097 include expulsion, suspension, and probation.

25. If a student is expelled, suspended for more than one year, or withdraws either in lieu of expulsion or suspension or pending a misconduct investigation, the student's transcript will be marked with this result "permanently without exception."[26]

---

[26] E.O. 109 at 22.

1

**THE DISCIPLINARY PROCEEDINGS
AGAINST JANE DOE**

2

3

26. Jane Doe entered Sonoma State University as a graduate student in a two-year Masters Program in Depth Psychology on or about September 1, 2016.

4

5

27. According to Defendant Sonoma State's Depth Psychology program website, "Students describe the program as fundamentally altering the way they experience their lives," providing "a container for exploring, experimenting with, and developing new and creative parts of the self" that "calls on head and heart" by being "both academically rigorous and experientially rich."

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



26

28. The Depth Psychology program's "Identity Statement" emphasizes the integration of scholarship with "embodied practices…"

27

28

14

**Our Identity Statement**

We are a community of reflective engaged learners who integrate scholarship and embodied practices, with the goal of contributing in reflective, creative and transformative ways to community life.

We draw from cross-cultural insights to teach skills in depth inquiry practices, rituals of personal and cultural transformation, and ecological awareness.

We seek to contribute to thriving cultural forms that promote soulful and sustainable living.

29. The 2016 – 2018 Depth Psychology cohort consisted of eleven students, including Jane Doe (then age 31), DB (then age 45), VH (then age 51), and NH (then age 25), and eight other students of varying genders.

30. The students took all of their classes together, including Psychology 542b "Methods of Depth Psychology."

31. Laurel McCabe, Director of the Depth Psychology Program, taught Psychology 542b during the Fall 2016 semester, and Defendant Felicia Matto-Shepard, a member of Sonoma State's Depth Psychology faculty, taught the course during the course during the Spring 2017 semester.

32. Felicia Matto-Shepard emphasized participation and engagement with uncomfortable topics in Psychology 542b.  Her syllabus for the course included a section entitled "Learning Environment," which encouraged students' "experimenting and maintaining curiosity in the face of discomfort."  The Learning Environment description concludes, "I encourage you to ride the edge of your comfort zone and push yourself into new terrain."

33. During the month of April 2017, the curriculum for Psychology 542b included an "Authentic Movement" exercise that was to occur on April 27, 2017.  The principles of authentic movement were discussed in class on April 20 and again on April 27, before the exercise was conducted.

34. Instructor Matto-Shepard began the April 27 class by directing the students to gyrate their hips in "hip circles" and inviting the students to "move like snakes."

35. Instructor Matto-Shepard instructed the students to pair up with a partner.

36. Student NH made eye contact with Doe, and the two decided to pair up.

37. Matto-Shepard arranged the class in two concentric circles: the inner circle made up of "movers," and the outer circle made up of "witnesses."

38. In the exercise, the movers would engage in authentic movement while the witness would observe, and then the two circles would switch places and roles.

39. Due to the odd number of students – 11 –Matto-Shepard herself acted as a partner for one of the students.

40. Matto-Shepard made the following statements to the witnesses before initiating the movement:

> Witnesses agree to watch your mover.  Try not to watch anyone else. It is important to keep eye contact on your mover so that if they open their eyes, they will see you and know that you are paying attention to them.  Pay attention to your own body. Track your own sensations as they move as you are tracking your mover.  Keep a double focus – one eye in and one eye out.  Watch your mover without judgment and with acceptance.

> If you begin to feel uncomfortable, stick with it, try to contain it.  If you feel overwhelmed at any point, you can step back or step out of the circle.  It is your responsibility to take care of yourself. If you need to step out, the other witnesses can help hold the container.  Now, look around the room at the other witnesses. Make eye contact.  Do you agree to uphold this container and help each other hold it?"

The witnesses all looked around the room and affirmed their assent to follow these guidelines.

41. Before the exercise began, Matto-Shepard made the following statements to the movers:

> Movers you are being held in a safe container.  Agree to keep your eyes closed and focus on your internal experience.  This is not about acting out the dream, but about moving your body authentically in the moment. **Don't limit yourself by following cultural norms.  This is not about dancing, but moving authentically.  Challenge yourself to move in ways that might be taboo or that you might not normally move.**

> Everything that happens can be a part of your "Authentic Movement" and can be turned into a learning experience.  It is your job not to take anything personally and to "own your own triggers."  For example, if someone accidentally hits you, notice your response. Do you recoil in fear?  Do you have the urge to hit them back?  Notice your response and let it affect you, make it part of your movement.

> This is not the space to do your deepest work.  You can choose how far you go.  If you start to feel overwhelmed, you can change your movement.  If it feels intense, you can change your dream image.  If you feel overwhelmed, you have the option to open your eyes and connect with your witness.

42. As the exercise began, Matto-Shepard instructed the movers to get into their starting dream image, and then to begin to physically move the dream forward from there.  Matto-Shepard emphasized that the goal was to allow the dream to unfold spontaneously, guided by the body.

43. During the movement, Matto-Shepard guided the movers to breathe and feel their bodies, to notice their spines and to and "stay connected" to the sensation.

44. After several minutes of movement, Ms. Matto-Shepard instructed the movers to stop, and then to record reflections in their journals for several minutes.

45. Matto-Shepard then instructed the witnesses to re-enact three images from the movement that they had witnessed.

46. Matto-Shepard then instructed the movers and witnesses to switch roles.

47. Matto-Shepard again reviewed the guidelines to each group of students, and the students assented to the guidelines of the "container."

48. The class then went through the same cycle of steps again, with the students' mover/witness roles reversed.

49. Following the Authentic Movement exercise, the class engaged in a discussion and debrief, along with Matto-Shepard.  No one mentioned anything unusual or upsetting during that discussion.

50. After the April 27 class, DB emailed professor Matto-Shepard, "I'm not sure if you saw how NH was reacting to [Jane Doe] when [Doe] was being the mover, but I'm a little worried about NH processing what she witnessed."  In the same email, DB wrote "I'm torn between whether I think [Jane Doe] crossed a line or is just authentically expressing what's going on for her.  It's a hard line to find and I am really more concerned about how [NH] has reacted to it."

51. On April 29, Matto-Shepard wrote to Doe, telling her that there was a "concern" about her Authentic Movement dance.

52. On April 30, NH wrote to Ms. Matto-Shepard to complain about Doe's dance.  Matto-Shepard wrote back to NH, "I could only see you," during the movement exercise.  "[DB] described to me what she saw," Matto-Shepard continued, "[h]ad I seen this, I would have

intervened." Despite the fact that she had admittedly not seen Doe's authentic movement, Matto-Shepard wrote to NH that "I want you to know that [Jane Doe]'s behavior was not appropriate for the classroom."

53. On or about May 1, 2017, Matto-Shepard informed Doe in a phone call that Doe had been accused of breaching Title V of the Sonoma State Code of Conduct, which prohibits "disorderly, lewd, indecent, or obscene behavior at a University related activity, or directed toward a member of the University community."

54. On Saturday, May 6, Depth Psychology student VH emailed Program Coordinator Laurel McCabe, threatening to withdraw from the program if Jane Doe was not disciplined for what VH termed "illegal" behavior. VH wrote: "I do not feel like I can be successful as a student while [Jane Doe] is in the cohort …," and wrote in her concluding paragraph, "I want to continue to participate in the pursuit of my degree. After last week's actions by [Jane Doe,] I know that I cannot complete my program with her as part of my cohort." (35) Though VH made clear that she did not witness any of Doe's movements on April 27, VH wrote to McCabe that "hearing about her actions alone was triggering and anxiety producing."

55. On May 9, 2017, Doe contacted Student Conduct Coordinator, Idonas Hughes, to inquire about any pending discipline. Mr. Hughes wrote to Defendant Shepard, copying Doe, asking for more information on Doe's report that the alleged violation came about "as a result of an assignment involving self-expression/movement."

56. On May 10, 2017, Psychology 542b student MR emailed Mr. Hughes, writing that Doe's dance was not sexual.

57. On May 11, 2017, student DB filed a written report alleging that Jane Doe had sexually harassed MH during the movement exercise on April 27, 2017. DB expressed concern that MH wouldn't speak up for herself. DB indicated that she likely would not continue as a student if Jane Doe was permitted to remain a student, writing "I am not sure how I am going to finish out the last two weeks let alone be in the cohort for another year with [Doe]."

58. Student VH also filed a complaint on May 11, 2017.

59. On May 18, 2017, Defendant Joyce Suzuki initiated an investigation pursuant to Executive Order 1097, and interviewed Complainants DB, MH, and VH together in one room.

60. Pursuant to Executive Order 1097, which requires that all investigations be completed within 60 working days absent an official extension of time, the investigation was required to be completed no later than August 15, 2017.

61. Also on May 18, 2017, Student Conduct Coordinator Idonas Hughes emailed Ms. Doe, assuring her in writing that "there will be no disciplinary action against you and it is my understanding that there will not be any academic consequence as a result of your actions during the class exercise."

62. On May 19, 2017, MH submitted a written complaint against Doe, which contained certain passages identical to the complaint DB had submitted eight days earlier.  In her complaint, MH wrote, "I never want to work with [Jane Doe] again, or have a conversation with her, and I do not wish to ever have to endure her facilitating a classroom experiential activity ever again."

63. Faced with the prospect of three out of eleven students potentially withdrawing from the Depth Psychology program because of their dislike of and baseless sexual harassment allegations against a fellow student, Sonoma State proceeded with its investigation against Jane Doe.

64. On May 19, 2017, Defendant Suzuki sent Doe a letter alleging that "[MH] and [DB] have alleged that on April 27, 2017, during an experiential exercise called Authentic Movement, you engaged in a display of a sexual activity, masturbation, instead of the assigned activity.  You did so without getting consent from [MH], the person assigned as the 'witness,' for the activity, or your other classmates who were exposed to your display."

65. On May 27, 2017, Jane Doe wrote to Instructor Matto-Shepard that "the situation has gotten extremely serious for me and there is a lot on the line for me in terms of my academic future, financial situation and life trajectory."

66. On May 27, 2017, Matto-Shepard emailed Doe, writing "[r]est assured that I hold the perspective that … your movement … was not egregious nor directed at anyone in a harassing manner.  You were simply doing the exercise and your interpretation of it."  Matto-Shepard

further assured Doe that "my sense is that [the investigation process] should be over soon and that it won't derail your education."[27]

67. On or about June 12, 2017, Defendant Suzuki represented to Doe that Sonoma State would drop the investigation if Doe left Sonoma State and agreed to forego the credits she earned in her first year in the Masters program (during which she received As in all of her classes). Defendant Suzuki encouraged Doe to accept this informal resolution, and informed her that Sonoma State would forgive her student loans if she did so.

68. On July 10, 2017, Doe declined informal resolution.

69. On July 18, 2017, Defendant Suzuki interviewed Doe for three hours.  During that meeting, Suzuki informed Doe that she could return to class when school resumed in late August.

70. According to the Complainants, during a meeting on July 27, 2017, Defendant Joyce Suzuki "stated unequivocally that [Jane Doe] would, in fact, be in class during the investigation."

71. During the same general time period – Summer 2017 – Doe and Doe's father participated in a phone call with Sonoma State's Dean of Extended Studies, who assured Doe that the Title IX matter would not threaten her ability to obtain her Masters Degree at Sonoma State.

72. On August 4, 2017, Defendant Suzuki interviewed Defendant Felicia Matto-Shepard.

73. The investigation did not end on August 15, 2017, and there is no evidence that an extension was requested or granted.

74. On August 19, 2017, Defendant Suzuki informed the parties that, as an "interim remedy," "[Jane Doe] will not be allowed to attend classes while the investigation is on-going."

75. On Tuesday, August 22, 2017, Sonoma State's fall semester commenced.[28]

76. According to the Title IX Report in this case, Defendant Suzuki "separated" from Sonoma State University in September 2017 (her LinkedIn page still lists her as Director of

---

[27] Email from Felicia Matto-Shepard to Jane Doe (May 27, 2017, 7:54 p.m.)

[28] Academic Calendars 2017 – 2022, *available at* https://www.sonoma.edu/academics/academic-calendar/academic-calendars-2017-2022 (last visited August 1, 2019).

Employee Relations and Compliance at Sonoma State University, a position that dates back to October 1998).[29]

77. When Defendant Suzuki separated from the University, the case was transferred to Defendant Jesse Andrews.   Either Defendant Andrews or Defendant Kidder informed Doe that she should expect a result in the case by mid-October, 2017.

78. Defendant Andrews did not alter the Interim Remedies imposed by Defendant Suzuki, meaning that Doe was still prohibited from attending her second year of the two-year Masters Program in Depth Psychology.

79. On September 25, 2017, Defendant Andrews received an email from Depth Psychology student GD, entitled "letter of concern regarding scapegoating of [Jane Doe]."  GD, a chaplain and registered nurse, expressed her opinion that Doe was being scapegoated in a manner that "is inappropriately discrediting her career and her work."

80. On Friday, October 27, 2017, Jane Doe requested to withdraw from Sonoma State.

81. On October 30, 2017, Defendant Andrews went on parental leave, and transferred the investigation to Defendant William Kidder, who was serving as Interim Title IX Director.  Doe learned of Andrews' leave when she received an out-of-office message in response to a request for an update on the case.

82. On November 21, 2017, Mr. Kidder interviewed the Complainants one at a time.

83. On November 29, 2017, Defendant Kidder received a letter from attorney Samantha Ramsey on behalf of her clients, MH, DB and VH.  The letter avers that Mr. Kidder represented in a November 21 meeting that "the evidence review would be produced approximately the first week of December" and "the report should be issued by December 15."

84. On information and belief, on December 1, 2017, DB and MH both withdrew from their Fall 2017 classes at Sonoma State.

85. On December 19, 2017 – two months after the mid-October date she had been told to expect a result – Jane Doe emailed Defendant Kidder saying she was "awaiting the result of the

---

[29] Joyce Suzuki LinkedIn profile, https://www.linkedin.com/in/joyce-suzuki-57860512 (last visited May 22, 2019).

Title IX investigation," and noting that she had been informed that she "could expect to hear something by mid-October."

86. Later on December 19, 2017, Mr. Kidder responded that "[t]he report should be issued in a few days."  The report was issued nine months later.

87. On January 13, 2018, Jane Doe again emailed Mr. Kidder asking about the status of the investigation.

88. Defendant Kidder never responded to Doe's January 13, 2018 email.

89. The second semester of classes at Sonoma State began on Monday, January 22, 2018.

90. On May 15, 2018 – more than one year after the Authentic Movement Exercise – Defendant Kidder took a personal leave, and the investigation was transferred back to Defendant Andrews.

91. On June 29, 2018, Defendant Andrews sent the Doe and the Complainants a notice that they could review the evidence adduced in the case and respond by July 8.

92. Doe consulted with counsel and successfully obtained additional time to review and respond to the evidence.

93. Doe reviewed the evidence and submitted a response on July 30, 2018.

94. On August 22, 2018, one year after Jane Doe has been prohibited from returning to class for the second year of her Masters program, Mr. Andrews informed Doe and the Complainants that Ms. Doe was not responsible for sexually harassing anyone.

95. On August 202, 2018, the Complainants submitted an appeal.

96. On October 10, 2018, the CSU Chancellor's Office denied the Complainants' appeal. Among other things, the Chancellor's Office concluded that "Complainants do not present evidence that … Respondent's behavior, especially within the constructs of a graduate level degree, would be considered by a reasonable person, in the shoes of Complainants, as sufficiently severe to limit the ability to participate in university programming."

97. On information and belief, Sonoma State, from the outset, presumed that Jane Doe was responsible in order to appease the Department of Education and advocates.

a.  On information and belief, the Sonoma State administration was cognizant of, and sensitive to, criticisms by students and the media about the manner in which colleges and universities around the country resolved allegations of sexual misconduct.  As a result, Sonoma State's decision-makers were motivated to favor the accusers over the accused, so as to protect themselves and Sonoma State from accusations that they had failed to protect students from sexual harassment and assault.

b.  Defendant Sonoma State was heavily invested in acceding to the demands of accusers even when there is no evidence of wrongdoing in order to avoid scrutiny from the Department of Education.  This is illustrated, in part, by Sonoma State's persistence in pursuing the investigation of the incident despite clear evidence that:

   i.  The Complainants' colluded in providing evidence;

   ii.  The Complainants' central allegation – that Doe masturbated in class – was contradicted by their own statements, the statements of other witnesses, and the glaring fact that no one else in their small class corroborated this allegation.

   iii.  The allegations as described by the Complainants clearly did not amount to sexual harassment under Executive Order 1097.

c.  On information and belief, Sonoma State effectively expelled Jane Doe by prohibiting her from attending class because it was afraid of an investigation from the Department of Education and/or a Title IX lawsuit from the Complainants.

d.  Defendant Sonoma State had a financial interest in assuaging the three Complainants who threatened to withdraw if Doe was allowed to continue in the program.

98.  The Defendants' actions against Jane Doe caused substantial damage to Doe's education, reputation, and earning potential.

99.  Doe was constructively expelled on or about August 19, 2019, when Defendant Suzuki prohibited her from returning to class for her second year of school, and one full year before Defendants Andrews, Sonoma State, and Trustees of the CSU all affirmed that no policy violation occurred.

100.     Defendants' actions denied Doe the benefits of the education at her chosen school, damaged her academic and professional reputations, and will impact her future earning potential and ability to apply to other graduate programs.

## COUNT I
## (42 U.S.C. §1983 -- VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES CONSTITUTION)

101.     Plaintiff Doe repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

102.     This Count is brought against the Defendants under 42 U.S.C § 1983.

103.     The Fifth Amendment to the United States Constitution, made applicable to the State of California by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

104.     The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

105.     The Due Process Clauses of the United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under the CSU Executive Orders.

106.     Doe has a protected interest in continued enrollment at California state colleges and Universities.

107.     Doe paid tuition and fees to Sonoma State University, therefore, creating a property interest in continued enrollment.  This contract-created property interest in continued enrollment at the University is the sort of legitimate entitlement protected by the Due Process Clause.

108.     Doe faced damage to her academic reputation and her freedom to her chosen career. The suspension and investigation inflicted reputational damage by effectively branding her, falsely, as a Title IX sex offender.  Sonoma State changed her legal status by effectively suspending her and removing her from the program, making it virtually impossible for her to seek employment in her field of choice or attend another school to continue her education.

24

109.     Doe's property interest is well established.

a.  The majority of federal courts of appeals that have decided the issue have held that students at public institutions of higher education have a property right to continued enrollment. [30]

b.  The Ninth Circuit has several times ruled on procedural due process claims involving public institutions of higher education; suggesting that the court assumed that a student has a protected liberty or property interest.

110.     Defendant Sonoma State University has a constitutional obligation to provide a fundamentally fair and reliable hearing process.  Doe's circumstances entitled her to a hearing prior to an effective 14 month suspension.  Sonoma State University's process fell short of due process requires by not providing Doe, who had denied the allegations, an explanation of the evidence in their possession and an opportunity to present her side of the story.

111.     Jane Doe was entitled under the Constitution of the United States to the opportunity to be heard in a meaningful manner at a hearing before being deprived of her education.

112.     Jane Doe has suffered severe damage as a result of Defendants' actions, including:

a.  Constructive expulsion from Sonoma State, which denied her the benefits of education at her chosen school, where she excelled in her first year of study;

b.  Irreparable damage to her academic and professional reputation;

c.  Derailment of her education and career while she waited in limbo for fourteen months to find out the results of the investigation, during which time she was prohibited from transferring to another institution.

---

[30] *See e.g. Doe v. Purdue Univ.,* 7th Cir. No. 17-3565, 2019 U.S. App. LEXIS 19464 (June 28, 2019); *Barnes v. Zaccari,* 669 F.3d 1295 (11th Cir. 2012*); Flaim v. Medical Coll. of Ohio,* 418 F.3d 629 (6th Cir. 2005); *Harris v. Blake*, 798 F.2d 419 (10th Cir. 1986); *Charleston v. Bd. of Trustees of Univ. of Ill. at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013); *Plummer v. Univ. of* Houston, 860 F.3d 767 (5th Cir. 2017).

d.  Severe emotional distress caused by Defendants' arbitrary decision to prohibit her from returning for her second year just days before the beginning of that school year, and Defendants' failures to communicate with Doe and to timely complete the investigation.

e.  Costs associated with unexpected moving and living costs and loss of merit-based scholarships.

113.    Pursuant to 42 U.S.C. §1988, Jane Doe is entitled to her attorney's fees incurred in bringing this action.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Jane Doe prays that the Court grant the following relief:

1.  Judgment in favor of Jane Doe awarding damages in an amount to be determined at trial.

2.  Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

**JURY DEMAND**

Plaintiff Jane Doe hereby demands a trial by jury of all issues so triable.

1 DATED: August 15, 209      Respectfully submitted,

2

3               _____/s/ Daniel C. Roth_____
               Daniel Charles Roth (270569)

4               LAW OFFICE OF DAN ROTH
               803 Hearst Avenue

5               Berkeley, CA 94710
               (510) 849-1389

6               dan@drothlaw.com

7

8               Joshua Adam Engel (0075769)

9               *Pro hac vice application pending*
               ENGEL AND MARTIN, LLC

10              4660 Duke Drive, Ste 101
               Mason, OH 45040

11              (513) 445-9600

12              (513) 492-8989 (Fax)
               engel@engelandmartin.com

13              _____/s/ Lara Bazelon_____

14              Lara Bazelon (Cal. Bar No. 218501)
               2130 Fulton Street

15              Kendrick Hall Suite 211
               San Francisco, California 94117

16              (415) 422-6202
               lbazelon@usfca.edu

17

18

19

20

21

22

23

24

25

26

27

28